52 A.3d 178

S.P., PLAINTIFF–RESPONDENT, v. NEWARK POLICE DEPART-
MENT, COUNTY OF ESSEX, STATE OF NEW JERSEY, LOUIS
ALFREDO SANTIAGO, JR., AND ROSANGELA DASILVA, DE-
FENDANTS, AND CITY OF NEWARK, DEFENDANT–APPEL-
LANT.

Superior Court of New Jersey
Appellate Division

Submitted January 11, 2012—Decided September 27, 2012.

Before Judges AXELRAD, SAPP–PETERSON and OSTRER.

*Anna P. Pereira, City of Newark Corporation Counsel,* attorney for appellant (*Gary S. Lipshutz,* Assistant Corporation Counsel, on the brief).

*Koulikourdis and Associates,* attorneys for respondent (*Sasha C. Intriago,* on the brief).

The opinion of the court was delivered by

AXELRAD, P.J.A.D.

In this appeal we address the interplay of the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 59:12–3, and the Prevention of Domestic Violence Act of 1991 (PDVA), *N.J.S.A.* 2C:25–1 to –35. We consider whether a victim and her attacker, boarders in a rooming house, can be considered "household members" under the PDVA. We also consider whether the PDVA, *N.J.S.A.* 2C:25–21, expressly creates an exception to the immunity provisions of the TCA such that the failure of police to arrest the attacker subjects the public entity to liability for subsequent damages to the victim, where the officers determined she was not a victim of domestic violence and exhibited no visible injuries.

On leave granted, the City of Newark (City) appeals denial of a motion for summary judgment seeking to dismiss the complaint of a sexual assault victim for damages based on its police officers' earlier failure to arrest and remove the assailant pursuant to the PDVA, *N.J.S.A.* 2C:25–21. Noting both sides "concede that the [PDVA] provides an express exception to the [TCA] immunity *N.J.S.A.* 59:5–5 provides to public entities and public employees"

for "failure to make an arrest," the motion judge found the PDVA applied to the instant case and was "an exception to general immunity." He concluded that S.P. and her attacker, boarders in a rooming house, were "household members" within the PDVA. The judge rejected the City's defense of absolute immunity and found material factual issues as to whether S.P. exhibited "signs of injury" to the responding officers that imposed an obligation to arrest under the PDVA, *N.J.S.A.* 2C:25–21, and whether the officers acted in good faith to afford them qualified immunity under the PDVA, *N.J.S.A.* 2C:25–22. We affirm the court's finding that these boarders were members of the same household within the intendment of the PDVA. We are satisfied, however, that the immunity provisions of the TCA apply as a matter of law because the officers did not have a ministerial duty to arrest pursuant to the PDVA under these circumstances. Accordingly, we reverse the denial of summary judgment, and grant judgment in the City's favor dismissing the complaint. Based on this determination, we need not reach the City's defense of qualified immunity under the PDVA.

I.

In January 2010, plaintiff S.P. filed suit against the City, alleging it was negligent, careless, and reckless when its police officers failed to arrest and remove Louis Alfredo Santiago, Jr. pursuant to the PDVA, *N.J.S.A.* 2C:25–21, after S.P. reported to police that Santiago had groped and propositioned her sexually.[1] S.P. claims she would not have been sexually assaulted by Santiago the following day if police had arrested him when they initially responded to the scene.

---

[1] S.P. also named the Newark Police Department, County of Essex, State of New Jersey, Santiago, Rosangela DaSilva (her landlord), and John Doe police officers 1–10 as defendants in the lawsuit. The County of Essex and the State of New Jersey have been dismissed. Both Santiago and DaSilva are in default. The Newark Police Department was an improperly pled defendant, and the complaint was never amended to name the individual police officers. Therefore, the present appeal only concerns the City, the sole remaining defendant.

After discovery, the City moved for summary judgment, arguing the PDVA was inapplicable because S.P. and Santiago were not "household members," and asserting absolute immunity under the TCA and qualified immunity under the PDVA. S.P. filed opposition. Following oral argument, the court issued an order denying summary judgment on May 27, 2011, accompanied by a written opinion. By order of July 25, 2011, we granted the City's motion for leave to file an interlocutory appeal.

II.

This case arose from the alleged sexual assault of S.P. by Santiago that occurred on February 17, 2008. Portions of S.P.'s and Officer Joseph Bernal's deposition testimony were submitted in connection with the summary judgment motion. The facts are not in dispute.[2]

S.P. stated in depositions that she moved into a three-floor boarding house on Milford Avenue in Newark about two weeks before the incident. Santiago was already a resident. They were the only residents on the third floor. They shared a bathroom at the end of their common hallway, but each bedroom had a lock on the door. All boarding house residents also shared a kitchen with communal appliances. About four days before the incident, S.P. first observed Santiago when they passed on the stairwell.

Shortly after midnight on February 17, 2008, as S.P. was walking from her bedroom to the shared bathroom, Santiago called to her from his open bedroom and invited her to have a drink with him. S.P. declined the invitation and went into the bathroom. As S.P. returned to her bedroom, Santiago approached her in the hallway, grabbed her breast and buttocks, told her she was wearing a nice shirt, and said, "I want to f- -k." S.P. pushed

---

[2] The responding officers had no independent recollection of their interaction with either S.P. or Santiago other than the limited information reflected by the entry in their motor patrol log. Neither officer prepared a separate incident report.

Santiago away and locked herself in her bedroom. Santiago then tried to open S.P.'s door by jiggling the door knob.

S.P. promptly called the police and told the dispatcher her roommate was trying to get into her room, he would not leave her alone, and he was drunk. Santiago continued turning the door-knob, and S.P. again called the police. When Officers Bernal and Felicia Ellison of the Newark Police Department arrived, S.P. went downstairs to let them in. She told them what had occurred, including the groping, unwanted sexual advance, and attempts to gain access to her room. S.P. related that she told them, "he grabbed me twice and he told me that he wanted to have sex and I pushed him away and I got back in my room and he tried to open the door, he wouldn't stop trying to open the door and that's when I called the cops." S.P. elaborated that she told them Santiago had "grabbed [her] breast" over her clothes and demonstrated to the officer how he did it by touching the officer in the chest area, and that Santiago had also "grabbed" her buttocks. S.P. also told them she was scared of Santiago and afraid to stay in the boarding house with him.

The officers then went upstairs to speak with Santiago. S.P. overheard the officers ask Santiago if he knew S.P. and if they were "a couple," to which he responded "no." Santiago admitted he had "touched" S.P., tried to get into her room, and was drinking. The officers told Santiago to stay away from S.P. and not to bother her again, and told S.P. to call the police if she had any more problems. S.P. stayed in her room for the rest of the night.

At about 11:00 the next morning, S.P. went to the bathroom to shower. As she exited the bathroom wearing a bathrobe, Santiago was standing outside the door, naked from the waist down. Santiago punched S.P. in the face, choked her, and raped her in the hallway. Santiago then pushed S.P. into his bedroom and continued to sexually assault her. S.P. managed to escape and run to a neighbor's home. The neighbor called the police. The

Newark Police Department responded to the scene, arrested Santiago, and filed criminal charges against him.

Officer Bernal testified in depositions that the Newark Police Department provided him with training on domestic violence matters; his understanding of his responsibilities as a police officer on domestic violence calls was to "[t]ake action if there's any substantial or any signs of injury or things of that nature"; if there was an "allegation of a violation of one of a variety of criminal statutes in the context of a domestic violence," he would "probably make an arrest"; and the decision to arrest would be "based on [his] training" and "tak[ing] all the facts into consideration." He explained that S.P.'s call was logged by dispatch as a "disorderly conduct" call, he did not make an arrest because there were "no grounds of domestic violence [and] no physical signs of injury," and where the two individuals "did not have any dating relationship ... live under the same roof [and] [t]hey're renting rooms," "based on [his] training and experience that's not a situation that would be domestic violence."

On February 21, 2008, S.P. applied for a temporary restraining order (TRO) against Santiago listing their relationship as "living in the same house." The court issued a TRO on that date with the qualifying relationship listed as "household member." On March 4, 2008, the court entered an ex parte indefinite continuance order, continuing all restraints previously ordered in the temporary restraining order, because defendant had not been served.

S.P. filed this lawsuit in January 2010. She alleged the City's police officers were negligent, careless, and reckless in failing to arrest and remove Santiago pursuant to the PDVA after he groped her and propositioned her sexually, which would have prevented the subsequent sexual assault. She also alleged the City was negligent, careless, and reckless in failing to properly train, educate, and supervise its officers under the PDVA and for its officers' failure to arrest.

The City moved for summary judgment, arguing its police officers were absolutely immune from liability for their failure to

arrest Santiago pursuant to the TCA, *N.J.S.A.* 59:5–5. The City also argued the PDVA did not apply because S.P. and Santiago were not "household members" under the PDVA. Alternatively, the City argued that even if the PDVA applied, the officers had discretion not to arrest Santiago during the initial police response because none of the four statutory factors mandating arrest as delineated in *N.J.S.A.* 2C:25–21(a) were present: S.P. did not "exhibit signs of injury," there was no warrant or restraining order, and no weapon was used. The City relied upon the following sections of the TCA: *N.J.S.A.* 59:3–2(a) ("A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him."); *N.J.S.A.* 59:3–5 ("A public employee is not liable for an injury caused by his . . . failure to enforce any law."); *N.J.S.A.* 59:2–2(B) ("A public entity is not liable . . . where the public employee is not liable.").

In opposition, S.P. argued the PDVA created an exception to the absolute immunity provision of *N.J.S.A.* 59:5–5, and required the officers to arrest Santiago when S.P. reported the initial incident and to offer her a restraining order. Specifically, S.P. contended Santiago qualified as a "household member" under the PDVA because they lived in the same boarding house and shared a common bathroom and kitchen, thereby rendering her a "victim of domestic violence" entitled to the protections of the PDVA. S.P. further argued she exhibited bodily injury as her "fear and trauma" were a clear indication of an impairment of her physical condition under *N.J.S.A.* 2C:25–21(c). She urged that even if the officers concluded she did not exhibit a bodily injury, Santiago's admissions to the police that he touched her breast and buttocks and tried to break into her bedroom were sufficient relevant factors for the officers to determine there was probable cause to make an arrest. *Ibid.* S.P. asserted that she would not have been raped had the officers provided her with the protections provided in the PDVA.

In reply, the City raised the good faith immunity provision of the PDVA, *N.J.S.A.* 2C:25–22. It argued that such provision

would immunize the non-party police officers and, derivatively, the City, for the officers' failure to arrest Santiago.

The court denied the City's motion for summary judgment by order of May 27, 2011. Noting the apparent concession by the parties and determining "the only remaining issue is whether the [PDVA] applies in the instant case," the motion judge found the PDVA did apply and was "an exception to general immunity." Specifically, he concluded the living arrangement between S.P. and Santiago fell under the liberal definition of "household member," *N.J.S.A.* 2C:25–19(d), as interpreted by our courts, specifically, *Hamilton v. Ali,* 350 *N.J.Super.* 479, 795 *A.*2d 929 (Ch.Div. 2001) (applying the PDVA to college suitemates who had separately locked bedrooms but shared a common area and bathroom), and *S.Z. v. M.C.,* 417 *N.J.Super.* 622, 11 *A.*3d 404 (App.Div.2011) (applying the PDVA to an adult male visitor who resided in the plaintiff's home for seven months and committed the predicate offense ten months later). Relying on the criteria considered in *Hamilton,* the judge found: (1) there was a constancy in the relationship due to the "close proximity of the parties' rooms and the reality of living in a boarding house, which necessitates interaction between the parties"; (2) the boarding house was similar to a standard multi-bedroom apartment or house; (3) personal grooming effects were stored and used in the common bathroom; and (4) the parties shared common space. The judge also found persuasive the Family Part judge's issuance of a TRO listing the parties as household members.

The motion judge next rejected the City's defense that the officers' decision to arrest Santiago was a discretionary one under *N.J.S.A.* 2C:25–21, entitling it to absolute immunity under the TCA as a matter of law. Recognizing that S.P. did not have a physical sign of an injury, the judge found "a grope" could reasonably be construed as a bodily injury. He also found S.P.'s complaint of fear, combined with the fact that Santiago had groped and propositioned her, and tried to break into her room, and S.P.'s two calls to the police were "all circumstances that would lead an

officer to think that she might be injured." The judge concluded it was "arguably a close call [ ] whether the plaintiff exhibited an injury" mandating arrest under *N.J.S.A.* 2C:25–21, but given the legislative intent of the PDVA and the facts of this case in a light most favorable to plaintiff, it should be left to the trier of fact to determine this question.

In considering the City's assertion of good faith immunity pursuant to *N.J.S.A.* 2C:25–22, the motion judge found that, given the facts as alleged, the question of whether the police actions were actuated by good faith was a credibility determination for the jury. The judge further reasoned that even if the matter were not subject to the PDVA, "given this shocking set of facts there are questions as to whether the officer's actions were palpably unreasonable in which case the rule of general immunity would also not apply."

### III.

We granted the City's motion for leave to appeal. On appeal, the City argues the motion judge erred in holding Santiago was a "household member" in the context of the PDVA. The City also argues the competing public policy interests of the TCA and the PDVA cannot be reconciled by imposing ministerial obligations on police officers to enforce the PDVA for stranger-on-stranger violence. Alternatively, the City argues its police officers' decision not to arrest Santiago, a purported household member, under the PDVA was within their discretion because S.P. did not exhibit any signs of injury.

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2. In deciding a motion for summary judgment, the trial court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party,

are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995). Thus, "when the evidence is so one-sided that one party must prevail as a matter of law, . . . the trial court should not hesitate to grant summary judgment." *Ibid.* (internal quotation marks and citations omitted).

Based on our standard of review, we perform the same task as the trial court—we first decide whether there was a genuine issue of material fact and, if not, whether the trial court's ruling on the law was correct. *Henry v. N.J. Dep't of Human Servs.,* 204 *N.J.* 320, 330, 9 *A.*3d 882 (2010); *Prudential Prop. & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.), *certif. denied,* 154 *N.J.* 608, 713 *A.*2d 499 (1998). "As only a legal issue is involved in the absence of a genuine factual dispute, that standard is de novo, and the trial court rulings 'are not entitled to any special deference.'" *Henry, supra,* 204 *N.J.* at 330, 9 *A.*3d 882 (quoting *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

The Supreme Court has explained the "guiding principle" of the TCA is that "immunity from tort liability is the general rule and liability is the exception." *Polzo v. Cnty. of Essex,* 196 *N.J.* 569, 578, 960 *A.*2d 375 (2008) (internal quotation marks and citations omitted). *See also Alston v. City of Camden,* 168 *N.J.* 170, 176, 773 *A.*2d 693 (2001). In enacting the TCA, the New Jersey Legislature "carefully outlined a design of broad immunity and limited liability, and declared that it is 'the public policy of this State that public entities shall only be liable for their negligence within the limitations of this [A]ct and in accordance with the fair and uniform principles established herein.'" *Marcinczyk v. State of New Jersey Police Training Comm'n,* 203 *N.J.* 586, 595, 5 *A.*3d 785 (2010) (citing *N.J.S.A.* 59:1–2).

The TCA achieves its policy goals by generally imposing immunity for public entities and public employees but "carving out narrow exceptions for which [the Legislature] determined liability

should attach," *Marcinczyk, supra,* 203 *N.J.* at 596, 5 *A.*3d 785, stating "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." *N.J.S.A.* 59:2–1(a). Consistent with the dominant theme of the TCA, "[w]hen both liability and immunity appear to exist, the latter trumps the former." *Fielder v. Stonack,* 141 *N.J.* 101, 117, 661 *A.*2d 231 (1995) (internal quotation marks and citations omitted).

■ The TCA also provides specific statutory immunity. *N.J.S.A.* 59:2–2(b) immunizes a public entity from vicarious liability for the acts or omissions of its employees who are immunized by the TCA. *Fielder, supra,* 141 *N.J.* at 118, 661 *A.*2d 231. The TCA grants an "absolute immunity to both public entities and their employees from liability for injuries caused by a failure to enforce the law." *Bombace v. City of Newark,* 125 *N.J.* 361, 366, 593 *A.*2d 335 (1991) (citing *N.J.S.A.* 59:2–4 and *N.J.S.A.* 59:3–5). Moreover "considerations of language and structure impel the inference that the absolute immunity of section 3–5 applies to non-action or the failure to act in connection with the enforcement of the law." *Bombace, supra,* 125 *N.J.* at 368, 593 *A.*2d 335.

Like the immunity for failure to enforce the law, the Legislature also provided a specific, unqualified immunity for failure to arrest. *N.J.S.A.* 59:5–5 states that, "[n]either a public entity nor a public employee is liable for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody."

The TCA further provides that "[a] public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him." *N.J.S.A.* 59:3–2(a). *See also N.J.S.A.* 59:2–3(a) (public entity counterpart containing the same language). Neither section, however, provides exoneration "for negligence arising out of acts or omissions of its employees in carrying out [ ] ministerial functions." *N.J.S.A.* 59:2–3, *N.J.S.A.* 59:3–2.

On the basis of this provision, S.P. argues the TCA does not bar her claim, urging that the PDVA imposes a ministerial duty on police officers to arrest under the circumstances presented in her case. *See N.J.S.A.* 2C:25–21(a). In construing the PDVA's arrest mandate, we must first consider the general purpose of the PDVA.

The Legislature enacted the PDVA to protect certain vulnerable persons from domestic violence, stating:

> The Legislature finds and declares that domestic violence is a serious crime against society; there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. *It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.*
>
> [*N.J.S.A.* 2C:25–18 (emphasis added).]

*See also Cesare v. Cesare,* 154 *N.J.* 394, 400, 713 *A.*2d 390 (1998) ("The Act and its legislative history confirm that New Jersey has a strong policy against domestic violence.").

The PDVA extends protection to "any person who is 18 years of age or older or who is an emancipated minor and who has been subjected to domestic violence by a spouse, former spouse, or any other person who is a present or former household member." *N.J.S.A.* 2C:25–19. "Because the [PDVA] is remedial in nature, it is to be liberally construed to achieve its salutary purposes." *Cesare, supra,* 154 *N.J.* at 400, 713 *A.*2d 390.

As the Supreme Court noted in *Wildoner v. Borough of Ramsey,* 162 *N.J.* 375, 388, 744 *A.*2d 1146 (2000), in enacting the PDVA, the "Legislature particularly sought to cure the reluctance on the part of police to arrest alleged perpetrators of domestic violence that had contributed to the underenforcement of the domestic violence laws." The Legislature clearly noted its intent "to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim." *N.J.S.A.* 2C:25–18.

Relevant to this appeal, "[w]hen a person claims to be a victim of domestic violence," and the responding law enforcement officer "finds probable cause to believe that domestic violence has occurred," the officer is required to arrest the alleged perpetrator and sign a criminal complaint if the victim "exhibits signs of injury caused by an act of domestic violence[.]" *N.J.S.A.* 2C:25–21(a). The Legislature elaborated:

> "the word 'exhibits' is to be liberally construed to mean any indication that a victim has suffered bodily injury, which shall include physical pain or any impairment of physical condition. Where the victim exhibits no visible sign of injury, but states that an injury has occurred, the officer should consider other relevant factors in determining whether there is probable cause to make an arrest."
>
> [*N.J.S.A.* 2C:25–21(c)(1).]

As noted by the Court in *Wildoner, supra,* 162 *N.J.* at 388, 744 *A.2d* 1146, the PDVA "also broadened the discretion of a police officer to arrest an alleged perpetrator ... provided that the officer had probable cause to believe the incident occurred[,]" citing *N.J.S.A.* 2C:25–21(b), which states:

> A law enforcement officer may arrest a person; or may sign a criminal complaint against that person, or may do both, where there is probable cause to believe that an act of domestic violence has been committed, but where none of the conditions in subsection a. of this section applies.
>
> [*N.J.S.A.* 2C:25–21(b).]

Moreover, to ensure protection for law enforcement officers, the Legislature enacted *N.J.S.A.* 2C:25–22, which provides:

> A law enforcement officer or a member of a domestic crisis team or any person who, in good faith, reports a possible incident of domestic violence to the police shall not be held liable in any civil action brought by any party for an arrest based on probable cause, enforcement in good faith of a court order, or any other act or omission in good faith under this act.[3]

 It is against this backdrop we review the facts of the case before us and address the issues of "household member" and the immunity of the police officers for S.P.'s injuries caused by their declining to arrest Santiago the night before the sexual assault.

---

[3] The words "or any person who, in good faith, reports a possible incident of domestic violence to the police" were added by *L.* 1994, *c.* 94, § 2, effective August 11, 1994. *See Wildoner, supra,* 162 *N.J.* at 389 n. 1, 744 *A.2d* 1146.

The City argues the motion judge erred in finding S.P. and Santiago were "household members" under the PDVA so she was not afforded statutory protection. We disagree.

As originally enacted, the domestic violence statute, *N.J.S.A.* 2C:25-3 to -16, *L.* 1981, *c.* 426, required cohabitation between the victim and the accused. *Bryant v. Burnett,* 264 *N.J.Super.* 222, 225, 624 *A.*2d 584 (App.Div.), *certif. denied,* 134 *N.J.* 478, 634 *A.*2d 525 (1993). The 1991 PDVA replaced this definition of victim with the more general term "present or former household member," thus expanding the protections of the PDVA to more potential victims. *Ibid.; Hamilton, supra,* 350 *N.J.Super.* at 482, 795 *A.*2d 929; *N.J.S.A.* 2C:25-19.

Although "household member" is not expressly defined in the statute, New Jersey courts have liberally construed the definition based on the premise that the PDVA is directed at "violence that occurs in a family or family-like setting. *N.J.S.A.* 2C:25-18." *Smith v. Moore,* 298 *N.J.Super.* 121, 125, 689 *A.*2d 145 (App.Div. 1997) (internal quotation marks and citation omitted). *See also N.G. v. J.P.,* 426 *N.J.Super.* 398, 402, 45 *A.*3d 371 (App.Div.2012) (upholding "former household member" status under the PDVA to middle age siblings who have not resided together since they were both children where there was sporadic harassment by the defendant and the present incidents of harassment arose directly from the parties' acrimonious family relationship); *S.Z. v. M.C., supra,* 417 *N.J.Super.* at 625, 11 *A.*3d 404 (holding that an employee of the plaintiff's business who resided in the plaintiff's home with plaintiff, his wife and three children for seven months, during which he spied on the plaintiff in the bathroom, and moved out ten months before he planted an audio-video camera in the plaintiff's truck, was a "household member" under the PDVA); *J.S. v. J.F.,* 410 *N.J.Super.* 611, 615, 983 *A.*2d 1151 (App.Div.2009) (rejecting the contention that a relationship which includes a payment of consideration for the other's time precludes the finding of a dating relationship under the PDVA, and noting that an au pair or live-in housekeeper would undoubtedly qualify as a "person who is a

present or former household member"); *Hamilton, supra,* 350 *N.J.Super.* at 486–88, 795 *A.*2d 929 (holding a college dormitory suitemate living in a separate bedroom is a "household member" under the PDVA); *Desiato v. Abbott,* 261 *N.J.Super.* 30, 33–35, 617 *A.*2d 678 (Ch.Div.1992) (prior to amendment of the PDVA to include a "dating relationship" as a jurisdictional ground, holding a plaintiff who maintained a separate residence but frequently remained overnight at the defendant's residence, where she maintained clothes, jewelry, and other personal effects, qualified as a "household member" under the PDVA).

As discussed by the motion judge, Family Part judges have considered the following criteria, by way of example and not limitation, to determine on a case-by-case basis whether the facts establish a family-like setting for the purposes of the PDVA:

1. Constancy of the relationship.

2. Over-night stays at each other's residence.

3. Personalty items such as jewelry, clothing and personal grooming effects stored at each other's residences.

4. Shared property arrangements, such as automobile usage, access to each other's bank accounts and one mailing address for billing or other legal purposes.

5. Familiarity with each other's siblings and parents socially in dining and/or entertainment activities together, and/or attendance together at extended family functions such as weddings.

[*Hamilton, supra,* 350 *N.J.Super.* at 486, 795 *A.*2d 929 (quoting *Desiato, supra,* 261 *N.J.Super.* at 34, 617 *A.*2d 678).]

Applying these factors, people who are unrelated, not personally or romantically involved, but residing in the same home, have been held to be household members. For example, in *Hamilton,* which we cited with approval in *S.Z. v. M.C., supra,* 417 *N.J.Super.* at 625, 11 *A.*3d 404, a Family Part judge found suitemates who shared a common area and a bathroom, but who had separate individual locked bedrooms, qualified as household members. *Hamilton, supra,* 350 *N.J.Super.* at 486–88, 795 *A.*2d 929. The suite consisted of a large common area where the suitemates would eat on occasion, a common bathroom, and four bedrooms. *Id.* at 480, 795 *A.*2d 929. All of the suitemates had a key to the suite entrance, but the keys to the individual bedrooms were only

held by the occupants of that individual room. *Ibid.* About one month after moving in, the defendant kicked in the plaintiff's bedroom door and slammed him against the wall. *Ibid.*

Applying the five suggested criteria, the court found "the constancy of the relationship [was] present by virtue of the close proximity of the parties' rooms, the common areas, and the reality of college life, which necessitate[d] the parties' daily contact and interaction." *Id.* at 486, 795 *A.*2d 929. Second, the court found overnight stays occurred daily as the sleeping arrangements were similar to that of "standard multi-bedroom apartment or house." *Ibid.* Third, the court found personal items were stored in each other's residences in the form of "personal grooming effects stored and used in the common bathroom." *Ibid.* Fourth, the court found the parties had shared property arrangements because "the parties used the furniture, stereo, television, pantry, and trash can contained within the common area." *Id.* at 487, 795 *A.*2d 929. The court further reasoned that although the suitemates had separate sleeping quarters, they were forced to interact as they shared a bathroom and common area, which placed the plaintiff "in a more susceptible position for abusive and controlling behavior in the hands of the defendant[.]" *Id.* at 488, 795 *A.*2d 929 (quoting *Storch v. Sauerhoff,* 334 *N.J.Super.* 226, 233, 757 *A.*2d 836 (Ch.Div.2000)). Furthermore, the case "certainly involved more than assaultive conduct between casual friends or relative strangers." *Hamilton, supra,* 350 *N.J.Super.* at 488, 795 *A.*2d 929 (quoting *Bryant, supra,* 264 *N.J.Super.* at 226, 624 *A.*2d 584). The court found the parties were household members based on the "qualities and characteristics of the particular relationship and not upon a mechanical formula in a definition." *Id.* at 487–88, 795 *A.*2d 929.

On the other hand, we held the PDVA did not grant the trial court jurisdiction to address harassment allegations brought against an unrelated former roommate because "[t]he harassment found by the judge, phone calls sparked by jealousy over a 'boyfriend,' bore no relationship to the temporary, part-time sea-

shore vacation housing arrangements which the litigating parties shared with other young women the prior summer." *Smith, supra,* 298 *N.J.Super.* at 125–26, 689 *A.*2d 145. Furthermore, that scenario was "unrelated to any domestic circumstance among the parties and surely not within the contemplation of the Legislature as expressed in its findings and declarations set out in the Act[.]" *Id.* at 126, 689 *A.*2d 145.

We disagree with the City that the attack here was between two strangers who happen to simply share a bathroom and a kitchen, but nothing else. We do not agree that defining "household members" under the PDVA to include persons of this status would "necessarily include apartment building dwellers living in separate apartments, or even hotel guests in separate rooms."

We do not conclude that all boarders in a rooming house are household members. Addressing the matter on a case-by-case basis, *Cesare, supra,* 154 *N.J.* at 416, 713 *A.*2d 390, we are satisfied the particular factual circumstances of this case gave rise to a finding that S.P. and Santiago were members of the same household within the intendment of the PDVA and the broad and flexible interpretation of "household member" articulated in the case law.

At the core of the PDVA is the existence of a relationship between the actor and the victim, which renders the victim a person protected by the PDVA as defined by *N.J.S.A.* 2C:25–19(d). Under the expanded definition of household member as interpreted by our courts, there has also been consideration of a particular living arrangement. The PDVA aims to protect those living in family or family-like settings. In *Hamilton,* relied on by plaintiff and the motion judge, the Family Part judge noted that the realities of dormitory life, which necessitate the parties' daily contact and interaction, created a "family-like setting." *Supra,* 350 *N.J.Super.* at 486, 795 *A.*2d 929.

S.P. and Santiago were not complete strangers. They resided on the same floor of the same house with bedrooms directly across the hall and shared a bathroom. Although the individual bedroom

doors had locks, the sleeping arrangements were similar to a home, multi-bedroom apartment, or a suite with shared space and multiple bedrooms. Crossing paths and interacting would be inevitable in this type of living arrangement. Although the relationship was just forming as S.P. had recently moved into the building when the incident occurred, she had already seen Santiago in the stairwell once and would naturally have been aware that she shared a living space with him, especially since they were the only people living on the third floor. The presence of a shared bathroom also increased the interaction between them, as was evident both on the night of the initial incident and the morning of the sexual assault. Moreover, S.P. and Santiago presumably kept personal items in their shared bathroom and each had access to the common kitchen area and its appliances along with the other boarders. Accordingly, this housing arrangement of close living quarters with shared common areas placed S.P. in a more "susceptible position for abusive and controlling behavior in the hands of [Santiago]." *See Storch, supra,* 334 *N.J.Super.* at 233, 757 *A.*2d 836.

Furthermore, in contrast with *Smith, supra,* 298 *N.J.Super.* at 126, 689 *A.*2d 145, where the alleged harassment "bore no relationship" to the former living arrangements, the unwanted sexual invitation and groping occurred as S.P. left the common bathroom, which is directly related to the living arrangements. Accordingly, S.P. falls within the statutory criterion of household member for protection under the PDVA.

We agree with the City, however, that the issuance of the ex parte TRO merely listing the parties as household members is neither evidential of the parties' legal status nor persuasive legal authority that S.P. and Santiago were in a qualifying relationship under the PDVA. It is clear from the record, however, that the motion judge did not rely on the TRO and merely added it as an afterthought after completing a sound analysis on the legal issue.

Officers Bernal and Ellison, however, did not have the hindsight of a judicial imprimatur on S.P.'s relationship with

Santiago. The arrest mandate of the PDVA, at least in this case, is not a ministerial function that falls outside the TCA immunity. Their investigation disclosed no obvious relationship that would trigger PDVA protection for S.P. Upon arriving at the boarding house, the responding officers first questioned and observed S.P., then spoke with Santiago. S.P. never "claim[ed] to be a victim of domestic violence," *see N.J.S.A.* 2C:25–21, or provided information from which the officers reasonably could draw that conclusion. Officer Bernal appropriately asked Santiago whether he and S.P. were a "couple," to which he responded "no." Thus, S.P. and Santiago did not fit within any of the enumerated examples of "household members" under *N.J.S.A.* 2C:25–19(d) (spouse, former spouse, having a child in common, or in a dating relationship). They were simply "liv[ing] under the same roof ... renting rooms." Accordingly, based on Officer Bernal's "training and experience," this was not a situation of domestic violence warranting specific action under the PDVA.

It is undisputed that S.P. did not exhibit any visible sign of injury. Nor did she state that an injury had occurred. The record does not reflect that S.P. vocalized or provided any indication that she was in physical pain or had any impairment of a physical condition. She simply told them Santiago had grabbed her breast and buttocks over her clothes and demonstrated to the officer how Santiago had grabbed her breast.

In view of the sexual attack the following morning, it clearly would have been preferable for the officers to have erred on the side of caution and arrested Santiago after he admitted groping S.P. and drinking or, at a minimum, viewed S.P. as a "victim" and pursuant to *N.J.S.A.* 2C:25–23, advised her of the right to seek a TRO.[4] Even if the officers' omissions might be open to some

---

[4] Pursuant to *N.J.S.A.* 2C:25–23:

A law enforcement officer shall disseminate and explain to the victim the following notice, which shall be written in both English and Spanish:
"You have the right to go to court to get an order called a temporary restraining order, also called a TRO, which may protect you from more

criticism, however, we are not persuaded they or the City are subject to civil liability as a matter of law.

The legislative policies of the TCA and DVA are compatible. Generally, the TCA provides police with an unqualified immunity for failure to make an arrest. *N.J.S.A.* 59:5-5. In *Lee v. John Doe*, 232 *N.J.Super.* 569, 571, 557 *A.*2d 1045 (App.Div.1989), police responded to a disturbance at a party where a guest had produced a knife and threatened to return and kill the host and a family member. The police did not remain at the scene. *Ibid.* The guest returned a few minutes later and shot the host in the leg. *Id.* at 571–72, 557 *A.*2d 1045. We affirmed the grant of summary judgment based on the immunity conferred by *N.J.S.A.* 59:5-5. *Id.* at 581, 557 *A.*2d 1045. We relied, in part, on our decision in *Wuethrich v. Delia*, 155 *N.J.Super.* 324, 326, 382 *A.*2d 929 (App. Div.), *certif. denied*, 77 *N.J.* 486, 391 *A.*2d 500 (1978), which cited *N.J.S.A.* 59:5-5, and held that although police may have a ministerial duty to investigate information from citizens concerning potential criminal activity, the failure to arrest does not subject a public entity to tort liability. *Lee, supra*, 232 *N.J.Super.* at 578, 557 *A.*2d 1045.

Additionally, the TCA immunizes public employees for injury that results from "the exercise of judgment or discretion vested in him[.]" *N.J.S.A.* 59:3-2(a); *see also N.J.S.A.* 59:2-3(a) (immunizing public entities for discretionary decisions). However, in circumstances where a ministerial duty exists, a public entity or public employee may not be immune from liability for negligence arising out such acts or omissions. *N.J.S.A.* 59:3-2(d), *N.J.S.A.* 59:2-3(d). A "discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Kolitch v. Lindedahl*, 100 *N.J.* 485, 495, 497 *A.*2d 183 (1985)(internal quotation marks and citation omitted).

abuse by your attacker. The officer who handed you this card can tell you how to get a TRO."

In contrast, a ministerial act is "one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." *Morey v. Palmer*, 232 *N.J.Super.* 144, 151, 556 *A.*2d 811 (App.Div.1989) (internal quotation marks and citations omitted). The burden is placed on the public entity to establish whether discretion was exercised. *Kolitch, supra,* 100 *N.J.* at 497, 497 *A.*2d 183.

We are cognizant that in *Tice v. Cramer,* 133 *N.J.* 347, 366, 627 *A.*2d 1090 (1993), the Supreme Court held the discretionary immunity of *N.J.S.A.* 59:3–2(a) did not apply to police conduct during a high-speed chase of a fleeing motorist, although finding immunity for injuries resulting from the pursuit under the TCA on other grounds.[5] The Court reasoned:

> The officer's conduct, comprised of the decision whether to pursue, how to pursue, and whether to continue to pursue, is also infinitely distant from high-level policy or planning decisions.... [T]o label this kind of determination by a public employee 'discretionary,' and therefore immune, would end all public employee liability, or practically all, for hardly any acts or omissions are not subject to some judgment or discretion.
>
> [*Tice, supra,* 133 *N.J.* at 367, 627 *A.*2d 1090.]

We are convinced, however, that the ensuing decisions of a responding officer to a call such as that from S.P., as detailed, in part, in *N.J.S.A.* 2C:25–21 and –23, requires a significant thoughtful analysis and exercise of personal deliberations regarding a variety of factors such that discretionary immunity should attach under the TCA. As previously discussed, the officer must determine whether the initial qualifier is met under the PDVA, i.e., that the person is a "victim of domestic violence" and there is probable cause to believe that "domestic violence" has occurred. *See N.J.S.A.* 2C:25–21. As is evident in this case, the decision does

---

[5] In 1997, the Legislature essentially codified *Tice* and related cases by amending *N.J.S.A.* 59:5–2 to add subsection (c), providing express TCA immunity for "any injury resulting from or caused by a law enforcement officer's pursuit of a person." *L.* 1997, *c.* 423, § 2. *See Alston, supra,* 168 *N.J.* at 178–79, 773 *A.*2d 693.

not always involve the enumerated categories of "household member" and is not always black and white.

The officer is then mandated to arrest the alleged perpetrator and sign a criminal complaint if he or she determines one of the enumerated factors is present, which involves another judgment call of whether or not the victim "exhibits signs of injury caused by an act of domestic violence." *N.J.S.A.* 2C:25–21(a)(1). The officer is guided under the statute to construe "exhibits" liberally to mean any indication of bodily injury, including "physical pain or impairment of physical condition" and where the victim complains of injury but exhibits no visible sign, the officer *should* consider other relevant factors in determining whether there is probable cause to make an arrest. *N.J.S.A.* 2C:25–21(c) (emphasis added).

Moreover, even in the absence of this condition, an officer *may* arrest or sign a criminal complaint, or both, against the alleged perpetrator if there is probable cause to believe an act of domestic violence has been committed. *N.J.S.A.* 2C:25–21(b) (emphasis added). This involves another discretionary decision. *See No Illegal Points, Citizens for Drivers Rights, Inc. v. Florio,* 264 *N.J.Super.* 318, 329, 624 *A.*2d 981 (App.Div.) (stating that "the word 'shall' is generally construed to be mandatory and the word 'may' permissive or directory"), *certif. denied,* 134 *N.J.* 479, 634 *A.*2d 526 (1993).

Considering the PDVA's expressed strong policy against domestic violence and focus on the protection of such victim, including the qualified civil immunity provided to law enforcement for an arrest based on probable cause, *N.J.S.A.* 2C:25–22, it is apparent the Legislature's desire is for police to err on the side of caution to maximize the protection of a potential victim of domestic violence. *See, e.g., N.B. v. T.B.,* 297 *N.J.Super.* 35, 43, 687 *A.*2d 766 (App.Div.1997) (holding that in a domestic violence case, in examining the bodily injury required to demonstrate simple assault, "[n]ot much is required to show bodily injury"; even "the stinging sensation caused by a slap" and "the slightest physical contact"

can constitute bodily injury for the purpose of simple assault) (internal quotation marks and citations omitted).

We are not convinced, however, that the Legislature intended to make officers such as those here civilly liable for the victim's subsequent injury if, within their judgment, she was not entitled to the protections of the PDVA. In fact, judges may ultimately differ as to whether the victim was entitled to PDVA protection as a household member, but had a judge that evening refused a TRO on that basis, there would have been express absolute immunity for the judge and State under *N.J.S.A.* 59:2–3(b) and *N.J.S.A.* 59:3–2(b). Considering the TCA's guiding principle of immunity as the general rule and liability as the exception, *Polzo, supra,* 196 *N.J.* at 578, 960 *A.*2d 375, a responding officer in this instance should be entitled to similar immunity.

Arguably, the police and City may also have absolute immunity based on the officers' failure to enforce a law. *See N.J.S.A.* 59:2–4, *N.J.S.A.* 59:3–5. The immunity provided under these sections extend to ministerial as well as discretionary acts. *Garry v. Payne,* 224 *N.J.Super.* 729, 735, 541 *A.*2d 293 (App.Div.1988).

To the extent S.P.'s claim was based on an asserted "special relationship" that imposed a duty on the responding officers to act and provided an exception to these TCA immunities, we have held that no such exception exists. *Macaluso ex rel. Macaluso v. Knowles,* 341 *N.J.Super.* 112, 116–17, 775 *A.*2d 108 (App.Div.2001) (holding New Jersey statutory law does not expressly create a duty to act so the California "special relationship" exception does not exist in this State, and criticizing as "clearly erroneous" the judge's characterization in *Campbell v. Campbell,* 294 *N.J.Super.* 18, 24–26, 682 *A.*2d 272 (Law Div.1996) of *Lee, supra,* 232 *N.J.Super.* at 579–81, 557 *A.*2d 1045, as holding that a "special relationship" automatically rendered the police officers' *N.J.S.A.* 59:5–5 immunity for failure to arrest inapplicable); *Blunt v. Klapproth,* 309 *N.J.Super.* 493, 504–09, 707 *A.*2d 1021 (App.Div.) (holding that the discussion in *Lee* about California's "special relationship" exception was dicta and should not be considered by the New

Jersey courts when applying the TCA because our statute does not require an initial analysis of a duty of care and we "should be cautious in sanctioning novel causes of action" considering the TCA is intended to be strictly construed to effectuate its purpose of limiting taxpayer liability), *certif. denied,* 156 *N.J.* 387, 718 *A.*2d 1216 (1998).

Reversed. Summary judgment is entered as a matter of law in favor of the City dismissing S.P.'s complaint.