63 A.3d 1233

ERICA TURNER AND ERIC TURNER, PLAINTIFFS–RESPON-
DENTS, v. TOWNSHIP OF IRVINGTON, DEFENDANT–APPEL-
LANT, AND ANJEANETTE MONROIG, JAMES FLAGLER, AND
AL MUTAH Q. SAUNDERS, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued March 4, 2013—Decided April 23, 2013.

Before Judges PARRILLO, SABATINO and MAVEN.

*Robert E. Levy* argued the cause for appellant (*Scarinci & Hollenbeck*, attorneys; *Mr. Levy* and *Michael A. Cifelli*, of counsel; *Mr. Levy, Mr. Cifelli*, and *Candida J. Griffin*, on the briefs).

*David Wendel* argued the cause for respondents (*The Serruto Law Firm*, attorneys; *Mr. Wendel*, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

By leave granted, defendant the Township of Irvington (defendant or Township) appeals from the denial of its motion for summary judgment dismissal of those counts of plaintiffs' complaint seeking to hold defendant vicariously liable for the conduct of its employees. Defendant argues that *N.J.S.A.* 52:17C–10(d), which immunizes 9–1–1 operators for conduct that is not wanton and willful, and *N.J.S.A.* 59:2–10, a general Tort Claims Act provision which immunizes public entities for the wanton and willful conduct of their employees, together prevent the Township from being held liable for its operators' conduct regardless of their level of culpability. We agree, and accordingly reverse and remand.

We provide the factual background only to the extent necessary to illustrate the issues on leave to appeal, which revolve around the handling of emergency telephone calls by two Irvington 9–1–1 operators, and of course in the light most favorable to plaintiffs Erica Turner and Eric Turner. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

Erica and her father Eric, as well as her mother and cousin, had repeatedly placed calls to 9–1–1 while Al Mutah Q. Saunders, Erica's former boyfriend and father of her five-month old daughter, was attempting to forcefully enter her residence on the evening of April 4, 2005, the same day he was served with a domestic violence final restraining order (FRO) obtained by Erica

for her and her family's protection. The first of ten calls was made by Erica's mother at 6:30 p.m., reporting that Saunders was outside the door in violation of an outstanding FRO and had kidnapped her granddaughter.

Subsequent calls within the next twenty minutes grew increasingly more desperate as Saunders' conduct escalated. At 6:39 p.m., Erica reported Saunders was going to kick the door in and that she was fearful for her life. The next call at 6:41 p.m. was from her cousin, a Newark police officer, who related Erica's account that Saunders had a gun and was threatening to kill her. Erica herself reported the threat minutes later and immediately thereafter her father also charged that Saunders had a gun. The dispatchers on duty, James Flagler and Anjeanette Monroig, responded that they would send officers to the scene as soon as they became available. When Erica's mother complained at 6:49 p.m. that no one had yet responded, one of the operators replied "you have to take that up with the mayor." The last call was placed by Erica at 7:51 p.m., who reported that Saunders was now inside the building, beyond the second door, and kicking at her apartment door.

Two police officers arrived at the scene at 8:36 p.m., nine minutes after receiving a call from the dispatcher (at 8:27 p.m.) to respond to the Turner residence. While the officers were informed that there was a "dispute," they were not told that a gun was involved or that the suspect was in violation of an FRO. By the time the officers arrived, Saunders had left.

One week later, on April 11, 2005, at approximately 6:15 a.m., Erica found Saunders climbing into her apartment through a window. Saunders had a gun and said to Erica, "I'm going to kill you, bitch." He struck her on the head with the gun, and ordered her to put clothes on their infant daughter. Erica complied and all three left the apartment, with Saunders holding the gun to Erica's back. When they encountered Erica's father approaching in the driveway, Saunders shot Eric. He then forced Erica to drive them onto the Turnpike and then Route 78, where they were

chased by police cars. Eventually, Saunders was arrested after a four-hour standoff.

Plaintiffs subsequently sued the Township, Monroig, Flagler and Saunders. As to the former, the complaint included counts sounding in both vicarious and direct liability. The latter counts, alleging negligent hiring/supervision, negligent training, negligent retention and civil conspiracy, were eventually dismissed on the Township's motion for summary judgment, as were those counts alleging intentional torts. As a result of these pre-trial rulings, the only counts remaining against the Township alleged negligence predicated on vicarious liability, chief among which is count four.

Count four alleged the Township is liable for the conduct of its 9–1–1 operators who acted unreasonably and with gross negligence in carrying out ministerial duties.[1] In support of their negligence theory, plaintiffs proffered the Irvington Township Police Department's standard operating procedures (SOPs), which mandate that the "call-takers" must enter information from a 9–1–1 call into a computer, and, if necessary, pass along updated information to the dispatcher via an intercom. The SOPs also list the call-takers' duties, which include determining the nature of the incident precipitating a call, entering that information into the computer, obtaining "as much information as possible" in order to help responding officers handle the incident, advising the dispatcher of calls and any information not in the computer entry, and

---

[1] Plaintiffs alleged in count three of their amended complaint that defendants negligently failed to send police officers to the Turner residence on April 4, 2005, and also negligently failed to arrest Saunders during an investigatory stop which allegedly took place "[s]ometime between April 4, 2005 and April 6, 2005[.]"

Plaintiffs alleged negligent infliction of emotional distress in count two, based on the claim that the 9–1–1 operators knew that Saunders was a serious threat but cavalierly treated plaintiffs' calls for help, leaving them feeling scared and helpless. As applied to the Township, count two is a claim of vicarious liability. Since the claim is one for conduct performed in the course of a 9–1–1 operator's duties, the same analysis with respect to count four would apply.

assisting the dispatcher in contacting the appropriate response units. The SOPs also list examples of calls that are classified as "emergency calls," which list includes domestic violence, weapons and related offenses, and kidnappings.

Plaintiffs also proffered the report of their liability expert, Thomas Seamon, a former Philadelphia police officer and current security consultant, who opined that the police officers should have been dispatched after the first 9–1–1 call because the caller stated that Saunders was in violation of a domestic violence FRO and that he had kidnapped a child. Seamon also faulted Flagler and Monroig for failing to obtain as much information as possible on the 9–1–1 calls; failing to advise the dispatchers of the incoming calls; and failing to recognize the situation as an emergency.

At first, the Township moved under *Rule* 4:6–2(e) for dismissal of count three alleging negligence in failure to arrest, arguing there is no liability for discretionary police conduct or for failure to arrest under *N.J.S.A.* 59:5–5. The motion judge converted the motion to a motion for summary judgment and denied relief, reasoning:

> The court notes that there are serious questions as to the timing of the failure to arrest as the police did not come to the scene of the domestic disturbance. There is also a question as to causation as the kidnapping of Erica Turner occurred several days after the failure to arrest. This is somewhat of a "close call" given the temporal issues may take this out of the strict purview of the Domestic Violence Act.

The Township subsequently moved for summary judgment dismissal of, among other things, counts three and four, based on the lack of any evidence of proximate causation or "willful or wanton" conduct on the part of Township employees. The motion was heard by a different judge who denied relief on February 10, 2012. On the issue of proximate causation, the judge cited the earlier motion ruling as "law of the case," and thus found that ground for relief wanting.

With respect to whether the 9–1–1 operators acted with wanton or willful disregard for the safety of Erica Turner and her family, the judge, in denying the Township's subsequent motion for

reconsideration on May 17, 2012, found that plaintiffs had "narrowly" met their burden to surpass the immunity provisions of *N.J.S.A.* 52:17C–10(d), noting that over multiple calls expressing "severe issues," the operators made "internally inconsistent statements . . . as far as what they were doing[.]" The judge emphasized, "this is not a one-time mistake where the call[-]taker maybe on one occasion didn't do what the call[-]taker needed to do, but calls that were repeated over and over again." As with count four, in denying the summary judgment dismissal of count two, the motion judge focused on the proofs presented, finding them sufficient to go to the jury and omitted any discussion of the immunity provisions of the Tort Claims Act, *N.J.S.A.* 59:2–10.

 This appeal follows, in which the Township argues that the court erred in failing to dismiss the vicarious liability counts of plaintiffs' complaint (count II, III and IV) because the 9–1–1 immunity statute, *N.J.S.A.* 52:17C–10(d), and the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to –12–3, specifically *N.J.S.A.* 59:2–10, collectively considered, immunize the public employer from civil liability for the conduct of its 9–1–1 operators, whether simply negligent or willful and wanton.[2] We agree.

The 9–1–1 immunity statute provides in pertinent part:

No telephone company, person providing commercial mobile radio service . . ., public safety answering point, . . . or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9–1–1 service, wireless 9–1–1 service or wireless enhanced 9–1–1 service. *This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.*

[*N.J.S.A.* 52:17C–10(d) (emphasis added).]

 This provision shields public entity employers and their 9–1–1 operators from civil liability for the negligent mishandling of

---

[2] The Township has not claimed TCA immunity under *N.J.S.A.* 59:2–3(d) (immunity for discretionary activities); or *N.J.S.A.* 59:2–4 or *N.J.S.A.* 59:3–5 (immunity for police officer's failure to enforce the law).

emergency calls. *Wilson ex rel. Manzano v. City of Jersey City,* 209 *N.J.* 558, 588, 39 *A.*3d 177 (2012). However, the immunity provision is "inapplicable if a 9–1–1 operator acts in 'wanton and willful disregard for the safety of persons or property.' " *Id.* at 587, 39 *A.*3d 177.

■ Here, we are satisfied that the record contains evidence from which a jury could reasonably find the 9–1–1 operators' acts and omissions constituted a "wanton and willful disregard for the safety of persons[,]" *N.J.S.A.* 52:17C–10(d) and (e), so as to defeat the immunity afforded to the Township under Title 52.[3] Although not shielded under the 9–1–1 immunity statute, the Township is nevertheless insulated from liability for such willful and wanton employee misconduct under the TCA's limitation on public entity liability contained in *N.J.S.A.* 59:2–10 ("A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."); *see also Fielder v. Stonack,* 141 *N.J.* 101, 130, 661 *A.*2d 231 (1995). Thus, if the 9–1–1 operators' actions are not found to constitute "wanton and willful disregard for the safety of persons," they and their employer are immune from civil damages to plaintiffs under *N.J.S.A.* 52:17C–10(d). *Wilson, supra,* 209 *N.J.* at 589, 39 *A.*3d 177. By the same token, if the 9–1–1 operators' actions are found to constitute "wanton and willful disregard for the safety of persons," the Township is not vicariously liable by virtue of *N.J.S.A.* 59:2–10.

Nothing in *Wilson* is to the contrary. Nonetheless, plaintiffs emphasize the less-than-absolute immunity afforded public entity employers when willful and wanton conduct is implicated. However, the Court in *Wilson* was construing only the 9–1–1 immunity statute and therefore its holding was limited accordingly. The immunity defense of the TCA, *N.J.S.A.* 59:2–10, was not before

---

[3] We note that the 9–1–1 operators, Monroig and Flagler, remain active co-defendants in the case, and are represented by their own counsel. They have not participated in the Township's interlocutory appeal.

the Court and therefore was never addressed. Granted, the Court did refer to other TCA immunities, namely the immunity provided public entities for discretionary activities, *N.J.S.A.* 59:2–3(d).[4] *Wilson, supra,* 209 *N.J.* at 569–70, 39 *A.*3d 177. But that reference was occasioned by the Appellate Division's reliance thereon after finding, erroneously as it turned out, that *N.J.S.A.* 52:17C–10 did not immunize 9–1–1 call takers in that case. *Wilson ex rel. Manzano v. City of Jersey City,* 415 *N.J.Super.* 138, 166, 1 *A.*3d 723 (App.Div.2010), *rev'd, Wilson, supra,* 209 *N.J.* 558, 39 *A.*3d 177. The Court, in reviewing that holding and ruling Title 52 did provide immunity, specifically noted, "there is no need to address the Appellate Division's analysis [of whether the 9–1–1 operators' acts were discretionary or ministerial] and ruling under the Tort Claims Act." *Wilson, supra,* 209 *N.J.* at 589, 39 *A.*3d 177. This language is hardly dismissive of, much less fatal to, the application of *N.J.S.A.* 59:2–10 to the case at hand.

Plaintiffs also argue that because Title 52 was enacted, as amended, in 1999—twenty-seven years after Title 59 was passed—"it is fair to conclude that the [L]egislature had knowledge of the latter but still determined that public entities would be liable for willful and wanton misconduct constituting a violation of the 9–1–1 immunity statute." Otherwise, they argue, the Legislature "would have seen fit to craft a further exception which narrows the rule of willful and wanton misconduct to private 9–1–1 facilities (assuming there are any), only, which is contrary to the express holding in *Wilson, supra,* 209 *N.J.* at 588–89, 39 *A.*3d 177." We disagree.

As noted, *Wilson* simply does not address a public entity's immunity from respondeat superior liability under the TCA, or the TCA's interplay with the 9–1–1 immunity statute, the latter of which renders a public entity and its personnel directly liable for

---

[4] *See also N.J.S.A.* 59:3–2(d), which provides that a public employee "is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable."

their willful and wanton conduct in the delivery or provision of 9–1–1 services. Title 59, on the other hand, specifically addresses the public entity's derivative liability, *N.J.S.A.* 59:2–2(a), immunizing the public entity from liability for the willful and wanton misconduct of its employees. *N.J.S.A.* 59:2–10.

We discern nothing in the legislative history of the 9–1–1 immunity statute that indicates an intent to displace the immunity provisions of the TCA. On the contrary, statutes dealing with the same subject matter "should be read *in pari materia* and construed together as a 'unitary and harmonious whole.' " *Marino v. Marino,* 200 *N.J.* 315, 330, 981 *A.*2d 855 (2009) (quoting *St. Peter's Univ. Hosp. v. Lacy,* 185 *N.J.* 1, 15, 878 *A.*2d 829 (2005)). This is because the Legislature is presumed to be aware of existing legislation when enacting another statute. *American Fire and Cas. Co. v. N.J. Div. of Taxation,* 375 *N.J.Super.* 434, 446–47, 868 *A.*2d 346 (App.Div.2005).

Both statutory schemes share the common goal of expanding the limitations on liability for public entities. The TCA's guiding principle is that immunity from tort liability is the general rule and liability is the exception. In enacting the TCA, the Legislature carefully outlined a design of broad immunity and limited liability, and declared that it is the public policy of New Jersey that public entities shall only be liable for their negligence within the limitations of the TCA "and in accordance with the fair and uniform principles established" therein. *N.J.S.A.* 59:1–2. The TCA achieves its policy goals by generally imposing immunity for public entities and public employees but carving out narrow exceptions for which the Legislature determined liability should attach, stating except as otherwise provided by the TCA, a public entity is not liable for an injury, "whether such injury arises out of an act or omission of the public entity or a public employee or any other person." *N.J.S.A.* 59:2–1(a).[5] Thus, "when both liability

---

[5] *N.J.S.A.* 59:2–2(a) holds a public entity vicariously liable for injury proximately caused by its public employees acting within the scope of their employ-

and immunity appear to exist, the latter trumps the former." *Coyne v. State Dep't of Transp.*, 182 *N.J.* 481, 488, 867 *A.*2d 1159 (2005) (quoting *Tice v. Cramer*, 133 *N.J.* 347, 356, 627 *A.*2d 1090 (1993)).

Similar policy goals of expanded immunity underlie *N.J.S.A.* 52:17C–10(d). In *Wilson, supra*, the Court summarized the relevant legislative history as follows:

> The Senate Sponsors' statement appended to the amendments that became (c), (d), and (e) of *N.J.S.A.* 52:17C–10 indicated that the new provisions were intended to "*expand* [ ] limitation of liability for telephone companies, wireless telephone companies *and other entities* in connection with enhanced 9-1-1 service or wireless enhanced 9-1-1 service and in connection with supplying assistance to investigative or law enforcement officers." Sponsors' Statement, *Statement to Senate Bill No. 1495* (Nov. 16, 1998) (emphasis added).
>
> A statement issued by the Assembly Policy and Regulatory Oversight Committee noted that the new law "alters the existing limitation of liability language to include wireless enhanced 9-1-1 service, except in the event of wanton or willful disregard for the safety of persons or property." Assemb. Policy & Regulatory Oversight Comm., *Statement to Senate Bill No. 1495* (Mar. 18, 1999); *see also* Assemb. Appropriations Comm., *Statement to Senate Bill No. 1495* (May 3, 1999) (using identical language to describe amended immunity provisions).
>
> [209 *N.J.* at 580–81, 39 *A.*3d 177.]

The *Wilson* Court emphasized the importance of maintaining parity in immunity between 9-1-1 operators and other emergency responders, such as police, fire, and first-aid personnel. *Wilson, supra*, 209 *N.J.* at 586–87, 39 *A.*3d 177. Additionally, the Court observed that immunity was an important and legislatively-appropriate benefit conferred on "municipalities and other public and private entities" in exchange for the burden of being "conscript[ed] . . . into providing and operating an enhanced 9-1-1 system." *Id.* at 588, 39 *A.*3d 177. Moreover, "the Legislature has decided that the overall benefits to our State from an enhanced 9-1-1 system require shielding telecommunications and public enti-

---

ment. As such, this provision qualifies the general declaration of immunity in Section 2–1(a). *See also N.J.S.A.* 59:2–3 and 59:3–2, which does not exempt a public entity for negligence arising out of acts or omissions of its employees in carrying out their *ministerial* functions.

ties, and their personnel, from potentially costly lawsuits for mistakes, even negligent ones." *Id.* at 589, 39 *A.*3d 177.

Thus, the immunity provision of *N.J.S.A.* 52:17C–10(d) is intended to have an extremely broad scope. Indeed, it would be rather paradoxical that a statute designed to "expand immunity," *Wilson, supra,* 209 *N.J.* at 581, 39 *A.*3d 177 would be applied, as plaintiffs suggest, to limit the immunity theretofore afforded to municipalities under the TCA. Accordingly, we conclude that *N.J.S.A.* 52:17C–10(d) does not qualify or limit the general rule of public entity immunity under *N.J.S.A.* 59:2–10, and therefore the Township remains immune for the wanton and willful misconduct of its 9–1–1 operators.[6]

Even so, plaintiffs contend that the conduct alleged in count three of their complaint, titled "police failing to arrest," is subject to neither Title 52 immunity insofar as it refers to public employee conduct other than that of 9–1–1 operators, nor Title 59 immunity, *N.J.S.A.* 59:5–5, but rather is preempted by the mandatory arrest provision, *N.J.S.A.* 2C:25–21, of the New Jersey Prevention of Domestic Violence Act (DVA), *N.J.S.A.* 2C:25–17 to –35. We disagree.

As to the former, the essence of count three, despite its label, is that 9–1–1 operators failed to timely alert police so as to effectuate Saunders' arrest and thus is merely another reiteration of 9–1–1 operator negligence alleged in count four, and covered, as noted, under Title 52. Although count three goes on to refer to a failure to arrest Saunders during a so-called investigatory stop, plaintiffs offered no proof of this allegation and, more importantly, have not named any police officers as party defendants. On the contrary, count three's allegations relate directly to the 9–1–1 operators whose alleged mishandling of the 9–1–1 calls is the gist of plain-

---

[6] The Township's reply brief raises the question of whether a public entity theoretically could be directly, rather than vicariously, liable under the 9–1–1 statute for causing harm to a plaintiff. Because no such direct claim of liability under the 9–1–1 statute was pleaded here, we need not address that abstract question.

tiffs' complaint. As such, plaintiffs cannot now seek to skirt Title 52 immunities by labeling their cause of action differently.

But even if count three could be construed to allege Township liability for the acts of its employees other than 9–1–1 operators, we find no legal support for plaintiffs' proposition, and the motion judge's concurrence therein, that the mandatory arrest feature of the DVA trumps the governmental immunity provided by *N.J.S.A.* 59:5–5. In fact, the law is to the contrary. *See S.P. v. Newark Police Dep't,* 428 *N.J.Super.* 210, 230, 232–33, 52 *A.*3d 178 (App. Div.2012) (finding the immunities provided by *N.J.S.A.* 59:5–5, *N.J.S.A.* 59:2–4 and *N.J.S.A.* 59:3–5 to be unqualified and absolute; the "legislative policies of the TCA and DVA [to be] compatible"; and the mere fact that the DVA contains "mandatory" language to not negate the discretionary decision-making employed to determine whether the factors that mandate arrest apply). *Cf. Town of Castle Rock v. Gonzales,* 545 *U.S.* 748, 758–61, 125 *S.Ct.* 2796, 2805–06, 162 *L.Ed.*2d 658, 670–72 (2005).

Because we find that the provisions of *N.J.S.A.* 52:17C–10 and *N.J.S.A.* 59:2–10 operate in combination to immunize the Township from liability for the conduct of its 9–1–1 operators, we need not consider whether the vicarious liability counts of plaintiffs' complaint should also have been dismissed for want of proof of proximate causation. Suffice it to say, the issue was never fully considered and resolved by the motion court. The first motion judge merely acknowledged the issue without deciding it while the next judge, in misapplying the law of the case doctrine, *Lombardi v. Masso,* 207 *N.J.* 517, 538–39, 25 *A.*3d 1080 (2011), simply chose to rely on her colleague's non-decision.

Reversed and remanded.