**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2043-19

THE ESTATE OF FRANK
JOSEPH COVELLO, JR.,
deceased, by administratrix
and administratrix ad
prosequendum GINA MARIE
BRUZZICHESI, and GINA
MARIE BRUZZICHESI,
individually,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

THE COUNTY OF MORRIS,

      Defendant-Respondent/
      Cross-Appellant,

and

TOWNSHIP OF MORRIS
PLAINS,[1] and THE TOWN
OF MORRISTOWN,

---

[1] Morris Plains is improperly referred to as a Township in the caption and record instead of a Borough. We will refer to Morris Plains as a Borough in this opinion.

Defendants-Respondents.

_____

Argued May 12, 2021 – Decided June 22, 2021

Before Judges Fuentes, Rose, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1831-17.

Albert C. Lisbona argued the cause for appellants/cross-respondents (Dwyer, Connell & Lisbona, attorneys; Albert C. Lisbona and Beth Connell O'Connor, on the briefs).

John M. Bowens argued the cause for respondent/cross-appellant (Schenck, Price, Smith & King, LLP, attorneys; John M. Bowens and Rebecca J. Rosen, on the briefs).

Eric L. Harrison argued the cause for respondent Borough of Morris Plains (Methfessel & Werbel, attorneys; Eric L. Harrison, Sarah K. Delahant, and Steven A. Unterburger, on the brief).

PER CURIAM

Plaintiff Gina Marie Bruzzichesi, Administratrix and Administratrix ad Prosequendum of the Estate of Frank Joseph Covello, Jr., and individually (collectively plaintiffs), appeal from the grant of summary judgment to defendant, Borough of Morris Plains (the Borough), and finding the Borough was entitled to discretionary immunity under the New Jersey Tort Claims Act (TCA), N.J.S.A. 59:1-1 to 12-3. In addition, plaintiff appeals the trial court's

order granting defendant County of Morris's (the County) motion for involuntary dismissal under Rule 4:37-2(b) at the close of evidence in plaintiffs' case, concluding plaintiffs failed to present expert testimony on the issue of liability and dismissing the complaint and amended complaint with prejudice.

In its cross-appeal, the County contends the trial court erred as a matter of law by denying its cross-motion for summary judgment and by ruling the County could be liable for punitive damages under the Survival Act, N.J.S.A. 2A:15-3. Because we agree with the County that it was entitled to summary judgment based on the same TCA discretionary immunity as the Borough, we reverse the trial court's denial of summary judgment to the County on the issue of liability; affirm the grant of summary judgment to the Borough; and dismiss the remainder of plaintiffs' appeal.

I.

The record reflects the following pertinent facts, which we consider in a light most favorable to plaintiffs. W.J.A. v. D.A., 210 N.J. 229, 238 (2012). In or around 2007, the County contracted with L. Robert Kimball & Associates (Kimball) "to assess the emergency communications of the municipalities in the County" and investigate the feasibility of a consolidated dispatch center at the County's Communication Center (CCC) to handle dispatch services for all

County municipalities. In February 2008, Kimball issued an extensive report entitled, "Morris County Consolidation and Facility Assessment," detailing its findings and recommendations.

The Kimball report recognized that "New Jersey has encouraged municipalities to share services or combine agencies as a way to save taxpayer dollars" and cited L. 2007, c. 56, legislation that "clearly identif[ies] the State's intent to move away from one- and two-position PSAPs [(public safety answering points)] and encourage[s] consolidation of services."[2]

In essence, Kimball concluded that the County should "move forward with a County consolidated dispatch center and radio system" and offered detailed technical recommendations about how it should proceed. Kimball determined that, absent consolidation, the County and municipalities "would spend $19.2 million in Fiscal Year 2014" but if the County "fully consolidated, the [CCC] budget for Fiscal Year 2014 would be approximately $15.1 million" with "cost savings to Morris County as a whole . . . [at] approximately $4 million annually."

---

[2] The relevant part of that legislative package amended N.J.S.A. 52:17C-3(b) to require, among other things, establishment of "a State plan for the emergency enhanced 9-1-1 system" and "consolidation of PSAPs as appropriate, consistent with revisions in the plan." It "condition[ed] the allocation of monies dedicated for the operation of PSAPs on the merging and sharing of PSAP functions by municipalities, counties and the State Police, consistent with the revised plan." Ibid.

A-2043-19

Thereafter, the Borough's Mayor, Frank Druetzler, had discussions with Borough officials "regarding the cost savings that would be realized by implementing" a Shared Services Agreement (SSA) with the County for dispatch services. Among the cost savings identified were elimination of the Borough's dispatcher position "and the ability to forego state-mandated upgrades to the Borough's [9-1-1] systems, which alone would have cost upwards of $500,000."

In October 2009, the Borough and the County executed the "Interlocal Services Agreement for Radio Dispatching Services" (the Agreement). Per the Agreement, beginning on January 1, 2010, the Borough would pay the County to provide dispatch services twenty-four hours per day, which included "[a]ccept[ing] and transmit[ting] emergency calls for police, fire and ambulance vehicles." The Borough paid the County approximately $160,000 to $170,000 annually for the services. The Agreement states that it was entered into pursuant to the Interlocal Services Act, N.J.S.A. 40:8A-1 to -11, and that the parties intended the Agreement's provisions "be construed to give full effect to the legislative intent expressed therein."[3]

---

[3] Prior to the Agreement's execution, in April 2007, the Legislature repealed the Interlocal Services Act and replaced it with L. 2007, c. 63, known as the Uniform Shared Services and Consolidation Act, codified at N.J.S.A. 40A:65-1 to 65-35. See Horsnall v. Washington Twp. (Mercer Cnty.) Div. of Fire, 405 N.J. Super. 304, 322 n.4 (App. Div. 2009).

A-2043-19

Druetzler signed the Agreement on behalf of the Borough. He certified that the Borough's decision to enter into the Agreement "was ultimately made as a result of the[] projected costs savings" involved with the elimination of its dispatcher and the ability to avoid upgrading its 9-1-1 system. Less than a month after executing the Agreement, the Acting Chief of Police for the Borough, Scott Thompson, terminated its dispatcher's employment effective at midnight on December 31, 2009. The termination letter explained that the Borough was abolishing the dispatcher position due to the "Borough Council's decision to contract with the County" for dispatch services "which will result in greater efficiency, economy and savings to the taxpayers of the Borough."

After the dispatcher position was eliminated, the Borough Police Department no longer had a staff member present twenty-four hours per day to greet the public. Following implementation of the Agreement, Druetzler stated, "the Borough installed a phone in the vestibule of the municipal building as a direct result of the elimination of the Borough's dispatcher positions." The red, wall-mounted telephone was accompanied by a sign that read "For Police Assistance Pick Up Phone." The red telephone was activated "by picking up the handset which connect[ed] it to the [C]ounty dispatcher" automatically.

6

Calls placed from the red telephone utilized a ten-digit Borough administrative phone line, not a 9-1-1 phone line, and were automatically forwarded to the CCC where its dispatch staff answered the incoming calls. The County assigned a call forwarding number to the Borough so that calls from the red telephone were routed appropriately.

According to Lieutenant Michael Koroski, Patrol Division Commander at the Police Department, the red telephone in the vestibule was "utilized by the public to request police assistance when the [D]epartment is unstaffed." In October 2016, he learned from the County that calls from the red telephone were "not being received by the appropriate parties up at the [CCC]." However, Koroski testified he thought the CCC was aware of the red telephone's location since the County provided "a specific number" for call forwarding.

According to the CCC Director, Michael Peoples, the County "had to give . . . revised phone numbers to all the police departments" because the County's phone numbers changed when its phone lines were transitioned from Verizon to a third-party provider. The County gave Koroski a new ten-digit telephone number to which calls from the red telephone could be forwarded. A third-party telephone vendor, Quality Communications, was responsible for reprogramming the red telephone to incorporate the new ten-digit telephone number.

On Saturday, December 17, 2016, at approximately 8:15 a.m., Covello drove into the Police Department parking lot. Surveillance video showed that Covello exited his vehicle and entered the Police Department vestibule area through unlocked doors while attempting to make a call on his cellular telephone. He then attempted to enter the Police Department lobby, but the doors were locked because the Police Department was unstaffed on Saturdays and Sundays. The video showed Covello squatted down and then stood back up.

Next, Covello picked up the red telephone in the vestibule, which connected him to Matthew Glogolich, Senior Public Safety Telecommunicator at the CCC. Surveillance video revealed that after initiating the call, Covello bent over, stood back up, and then collapsed onto the ground at 8:17 a.m. An audio recording of the eleven-second telephone call revealed the following:

:01   [Glogolich speaking] Morris Plains Police 160.

:05   [Glogolich speaking] Hello?

:07   [a noise is heard]

:08   [Glogolich speaking] Hello?

:11   [call is disconnected]

More than five hours later, at 1:36 p.m., Lieutenant Michael Rolph of the Police Department, who was in charge of the patrol shift that day, was headed

to the basement to send a telefax when he discovered Covello's body on the floor in the vestibule area. Rolph noticed a cellular telephone next to Covello and the receiver of the red telephone in his left hand. He evaluated Covello for signs of life and found that he "was cold to the touch, had no pulse, and was not breathing." Rolph called for an ambulance, which arrived about four minutes later. Medical personnel confirmed that Covello was deceased. An autopsy concluded that Covello died of natural causes related to occlusive coronary artery disease.

At the time of Covello's death, staff were present at the Police Department only between the hours of 8:30 a.m. and 9:00 p.m. Monday through Friday, and the Department was left unstaffed on Saturdays and Sundays. According to Police Chief Jason Kohn, the hours during which the Police Department is staffed or unstaffed "were decided in connection with conversations and discussions which occurred following the implementation of" the Agreement. Rolph testified at a deposition that even when the Police Department is unstaffed on the weekends with no staff present to greet the public, the vestibule door is always unlocked.

As to why Covello was not found sooner, Rolph explained that the police officers working on the day of Covello's death were on patrol duty and did not

A-2043-19

have to pass through the front vestibule to enter or exit the locker room area. He said that while a surveillance camera "captures a portion of the vestibule" and records twenty-four hours per day, the video feed is displayed on a screen located in the lobby area that is not monitored on the weekends.

Glogolich testified at his deposition that a police dispatcher's duties include answering any 9-1-1 or administrative phone calls, providing emergency medical instructions, and dispatching field units. As a Senior Public Safety Telecommunicator, Glogolich performed these duties while also serving as a first-line supervisor to other dispatchers.

Glogolich testified that he determines whether an incoming call on an administrative line is emergent "[b]ased on the caller statements" and that there is "no way of knowing if it's an emergency or not if there's no response." According to Glogolich, the majority of the administrative calls received by the CCC are "non-emergent" and typically pertain to requests for records, noise complaints, or parking issues. As noted, Glogolich did not receive a verbal response from Covello during the call placed from the red telephone. And, Glogolich could not trace the exact location of the call because neither the incoming call's telephone number nor the address from where the call originated

were available to him, unlike a 9-1-1 call, which has "enhanced locating capabilities."

While Glogolich knew the call was coming from a "Morris Plains phone line," he testified that he had no way of knowing whether it originated from the Police Department vestibule, the Mayor's office, or any other Borough office location. Had the call originated from a 9-1-1 phone line, it would have been traceable. Under the circumstances, he was unable to determine whether the call constituted an emergency, "had no information on the location to send someone," and did not know what "service was needed." In addition, Glogolich could not recall hearing any background noise during the call. Ultimately, he disconnected the call and did not receive a call back.

Glogolich testified that the written policy and procedure manual followed by the dispatchers, entitled "the Morris County Communications Division Policy and Procedures Concerning [9-1-1] and Administrative Call Processing" (Policy), does not indicate how long a dispatcher should wait before disconnecting an administrative call when no verbal response is received. When interviewed by the Morris County Prosecutor's office, Glogolich reiterated that he was unable to identify where Covello's call was coming from or how to call the number back due to the lack of "caller ID," and stated that the County did

not have "any call back procedures for administrative phone lines. Only for [9-1-1]'s."

Glogolich's supervisor, Michael Peoples, the Communications Director at the CCC as of February 2010 (a month after the Agreement took effect), testified at his deposition that he promulgated and approved the Morris County Communications Division Policy and Procedures Concerning [9-1-1] and Administrative Call Processing. Peoples acknowledged administrative calls could constitute emergency calls, and that the Policy states administrative lines "also carry emergency calls reporting emergency situations." He explained that, per the Policy, 9-1-1 calls are answered first, followed by [ten]-digit administrative phone lines, but that the dispatchers go "above and beyond the standard to attempt to make sure that [they] try to answer those [ten]-digit numbers because they may be carrying emergency phone calls." Peoples testified that the Borough—not the County—was responsible for installation, maintenance, and configuration of the red telephone. He never explained the differences between an administrative line and a 9-1-1 line to the Borough or advised it had the option of adding a 9-1-1 line.

Peoples also testified that the dispatchers treat every call as a possible emergency call and process emergency calls from administrative lines "in the

A-2043-19

same manner that we do the [9-1-1] call." However, the dispatchers "need some type of voice interaction with the caller to determine if there's an emergency occurring" on an administrative call. Peoples testified that the Policy does not specify what a dispatcher should do with "a silent administrative call." After reviewing Glogolich's handling of Covello's call by listening to the audio recording and reviewing the relevant policies and procedures, Peoples concluded that Glogolich "acted within [the] policies and procedures consistent with his training and skills."

Both Koroski and Kohn testified at depositions that they did not know prior to Covello's death that the CCC was unaware of the location of calls made from the red telephone. Rolph and Kohn conceded that the phone system in place at the time of the incident was of no use in an emergency situation when the caller could not speak. Kohn admitted that it was "logical" to assume that the red telephone was an "emergency phone."

On the afternoon of Covello's death, Koroski and Kohn tested the red telephone and discovered "an approximate [twenty]-second delay" before the call was picked up by the CCC. Kohn had never previously tested the red telephone, although Koroski testified that he had done so in October 2016. Kohn believed that the red telephone had been installed in January 2010, years before

he became Chief of Police in 2014, and testified that he had neither initiated any changes to it, nor regularly checked it to make sure that it was working, nor confirmed where it was connecting to.

Five days after Covello's death, Kohn, Koroski, a County representative, a Quality Communications representative, and others, attended a meeting to discuss concerns about the red telephone. The Quality Communications representative explained that because the red telephone utilizes an "extension feature" and "must search for a line to use from a trunk of lines in order to complete the call," this causes "potential delays in the line being answered." The County representative explained that "because the phone was using an extension type format," it "would not be able to be specifically identified" at the CCC.

To remedy the situation, the parties decided to use "a dedicated line" for the red telephone going forward as opposed to the extension feature. The color of the phone was changed from red to black, and it now functions as "an emergency phone which is part of the [9-1-1]" system. A sign posted by the black telephone advises users to "press the red button" for an "emergency [9-1-1] police response" and to "press the yellow button" for "non-emergency police assistance."

Glogolich confirmed that after Covello's death, changes were made to the phone system that allow a County dispatcher answering a call at the CCC to see an icon on his or her computer screen, which indicates whether a call is coming from the Police Department or any other police department for which the County handles dispatch services. Peoples testified that he "made sure all the phone lines were provisioned to report caller ID" and that the caller ID was associated with each specific phone and not simply "a random line in the Borough."

On August 21, 2017, Bruzzichesi filed a wrongful death and survivorship complaint, pursuant to the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6, and the Survival Act on behalf of the Estate and herself individually, alleging that defendants' negligent and palpably unreasonable acts were the proximate cause of Covello's death. The Borough and the County filed answers to the complaint and asserted immunities and affirmative defenses, including those available under the TCA, and also pled cross-claims for contribution and indemnification.

On November 17, 2017, the trial court dismissed the complaint, without prejudice, against defendant Town of Morristown, for failure to state a claim upon which relief could be granted. On December 4, 2017, plaintiff filed an amended complaint to include claims for pain and suffering and loss of enjoyment of life on behalf of Covello.

15

Following a period of discovery, the Borough moved for partial summary judgment. On December 3, 2018, the trial court granted the Borough's motion for partial summary judgment and dismissed Bruzzichesi's individual claims (the sixth count of the amended complaint). The November 17, 2017, and December 3, 2018, orders are not challenged on appeal.

On March 22, 2019, the Borough filed a motion for summary judgment as to the outstanding claims against it. Plaintiffs and the County cross-moved for summary judgment. In support of their cross-motion for summary judgment against the Borough, plaintiffs retained Wayne S. Fisher, Ph.D., a senior policy advisor at the Center on Policing at Rutgers University, to review the policies and procedures of the Morris Plains Police Department, at the time of Covello's death. After reviewing various documents and information obtained through discovery, Dr. Fisher rendered an opinion in a September 20, 2018 report, stating that the fundamental duty of local law enforcement is to protect and safeguard "lives and safety of the public," and this duty "is an ever-present component in virtually everything police officers are asked to do." He also opined that local police departments are responsible for implementing policies toward that end, including those "directly related to the provision of emergency medical services."

16

With respect to the Agreement with the County, Dr. Fisher concluded that the Borough's "decision to enter into an agreement with Morris County for communications services, and thus eliminating staffing at police headquarters during certain periods of the week was a policy decision." However, he opined that "all operational procedures established to ensure that essential services were provided to the public during those periods of time were 'day-to-day' responsibilities . . . within the purview of the chief of police."

Dr. Fisher explained that although "there are valid reasons" for small police departments to be unstaffed during certain hours, "it is imperative that accommodations be made to serve persons seeking assistance who may or may not be aware of a municipality's policy regarding the [staffing] of its police station" as "it is universally understood and accepted that when a person is in need of help a place well suited to provide same is a police station." He added that it is reasonable for the public to expect that police personnel will either be present at the police headquarters or available to assist "at any hour."

In this case, Dr. Fisher found "no evidence of any visible notification that headquarters was not [staffed] during certain hours, and nothing that advised calling [9-1-1] for emergency assistance at such a time." He emphasized that the Police Department kept the vestibule doors unlocked and had a red telephone

17

mounted on the wall that "erroneously communicated" that it could summon emergency help which "was of no use to someone who could not speak." He found that no one from the Police Department tested the red telephone after the changes were made to the call forwarding number in October 2016, and that they "fail[ed] to ensure that the red telephone" provided address information to the CCC.

In addition, Dr. Fisher opined that "[t]he absence of direction to inform those seeking help in an emergency, and the absence of the means to provide for the delivery of that help, represents a significant breach of duty and responsibility on the part of police department leadership" and "[t]he existence and persistence of conditions such as those at Morris Plains Police Headquarters on the day the decedent died were irresponsible and breached the duty of police care to provide aid needed to protect the life of someone in emergent need." He also opined that the Police Department's failure to ensure that calls from the red telephone transmitted location information to the CCC, as a call from a 9-1-1 line would, "constituted . . . an inexplicable breach of their most fundamental duty."

On May 24, 2019, after hearing oral argument, the trial court reserved decision. In a written decision dated May 31, 2019, the trial court granted the

Borough's motion for summary judgment; granted the County's cross-motion for summary judgment, in part, as to Bruzzichesi's individual claims; and denied plaintiffs' cross-motion for summary judgment. In its written opinion granting summary judgment to the Borough, the trial court found as a matter of law that the activities at issue "constitute[d] discretionary, rather than ministerial, activities that fall within the immunity enumerated in the TCA at N.J.S.A. 59:3-2."

Citing Costa v. Josey, 83 N.J. 49, 55 (1980), the trial court determined that the Borough entered into the Agreement with the County "for cost-saving purposes," as evidenced by the Kimball Report and the "fact it was entered into pursuant to the Uniform Shared Services and Consolidation Act, N.J.S.A. 40A:65-1 . . . ." The Borough's decision to have someone stationed at the Police Department "[thirteen] hours per day from Monday [to] Friday only" was deemed by the trial court to be "inherently discretionary as well, as it certainly is a policy-level decision that involved balancing competing considerations of allocating scarce resources," as delineated in Costa. The court dismissed the complaint and amended complaint as to the Borough with prejudice.

The trial court denied the balance of the County's cross-motion for summary judgment as to liability and concluded, as a matter of law, that its

19

activities, including those of its employees, did not constitute "ministerial activities" falling within the ambit of the TCA, N.J.S.A. 59:2-3.[4] Moreover, the trial court determined that since Glogolich "interacted" with Covello "directly," and did not remain on the call, attempt to call the number back, or ascertain the location of the call, the County was not entitled to discretionary immunity.

The trial court concluded that Covello's telephone call was also not immune under the Emergency Telecommunications Services Act (ETS), N.J.S.A. 52:17C-10(d) and (2). Since the CCC did not have a procedure in place on handling a person incapable of speaking, the trial court noted the decision is "ministerial in nature." Because the trial court reasoned that the Agreement "passed on" telephone responsibilities to the County to "accept and transmit emergency calls for police" twenty-four hours per day, the court concluded the decision to "have the red vestibule phone use an administrative line rather than [9-1-1] is the responsibility of the County."

As to punitive damages, the trial court held that the County could be liable under the Survival Act premised upon Glogolich's conduct in handling Covello's call. The trial court denied the TCA aspects of the County's cross-motion for summary judgment and denied plaintiffs' cross-motion for summary judgment.

---

[4] The trial court mistakenly cited N.J.S.A. 59:3-2 instead of N.J.S.A. 59:2-3.

A memorializing order was entered. Plaintiffs and the County moved for reconsideration, and both motions were denied.

Following the trial court's decision on the above-referenced motions, the matter proceeded to a jury trial before a different judge in October 2019. On October 30, 2019, at the conclusion of plaintiffs' case, the County made an oral motion to dismiss the complaint and amended complaint under Rule 4:37-2(b) for failure to present expert testimony on the issue of liability. After conducting oral argument, the trial court granted the motion the following day. Plaintiffs moved for reconsideration, which was denied. On December 12, 2019, the court entered judgment dismissing the complaint and amended complaint against the County with prejudice. This appeal and cross-appeal ensued.

On appeal, plaintiffs argue two points: (1) the trial court erred in granting the Borough's motion for summary judgment and finding it is entitled to discretionary immunity; and (2) the court erred in granting the County's motion for involuntary dismissal at the close of plaintiffs' case.

In its cross-appeal, the County argues three points: (1) the trial court correctly concluded that plaintiffs' claims against the County required expert testimony; (2) the court erred in finding that the Borough was entitled to discretionary immunity and that the County was not; and (3) the court erred in

21

its ruling on punitive damages. Because we conclude that the trial court erred in denying the County's motion for summary judgment as to liability and that the County was also entitled to discretionary immunity, we address point two of the County's cross-appeal first.

## II.

We review entry of summary judgment de novo, applying the same legal standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

"When no issue of fact exists, and only a question of law remains, [we] afford[] no special deference to the legal determinations of the trial court." Ibid. (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Indisputably, the Borough and the County are public entities that are liable for their negligence only to the extent permitted by the TCA. N.J.S.A. 59:1-2; N.J.S.A. 59:1-3; N.J.S.A. 59:2-1(a); see Posey v. Bordentown Sewerage

Auth., 171 N.J. 172, 181-82 (2002) (counties and municipalities are public entities that fall within the coverage of the TCA).

As a starting point to our TCA analysis, N.J.S.A. 59:2-1(b) provides that "[a]ny liability of a public entity established by this act is subject to any immunity of the public entity . . . ." The TCA "delineates both procedural and substantive requirements for bringing a tort claim against the State, public entities, and public employees." Nieves v. Off. of the Pub. Def., 241 N.J. 567, 575 (2020). When enacting the TCA, the Legislature declared that it is "the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein." N.J.S.A. 59:1-2.

"It is well recognized that, through the TCA, the Legislature established that '[g]enerally, immunity for public entities is the rule and liability is the exception.'" Nieves, 241 N.J. at 575 (quoting Fleuhr v. City of Cape May, 159 N.J. 532, 539 (1999)). "The statute strikes a balance between allowing municipal governments to perform their necessary functions without an avalanche of tort liability while holding public entities accountable for injuries that are a direct result of their wrongful conduct." Lee v. Brown, 232 N.J. 114, 127 (2018).

Toward that end, N.J.S.A. 59:2-1(a) states that "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." But N.J.S.A. 59:2-2(a) provides that "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." That said, "[a] public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J.S.A. 59:2-2(b).

Applying these well-settled principles, we affirm the trial court's grant of summary judgment to the Borough. Plaintiffs principally argue that the court erred in finding that the Borough was entitled to immunity under N.J.S.A. 59:2-3 (discretionary immunity) for "all decisions" emanating from the discretionary decisions to enter into the Agreement and eliminate the dispatcher position. We disagree.

Plaintiffs' cause of action against the Borough is barred by the discretionary immunity provision of N.J.S.A. 59:2-3, which states:

> a. A public entity is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity;

24

b. A public entity is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public entity is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

d. A public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public entity was palpably unreasonable.

N.J.S.A. 59:2-3 further states that "[n]othing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions."

Utilizing a similar analytical framework, N.J.S.A. 59:3-2 establishes discretionary immunity for public employees. As is true for public entities, the statute provides that "[n]othing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions." N.J.S.A. 59:3-2.

Our jurisprudence explains the distinction "between a planning-level or discretionary decision, which is generally entitled to immunity, and an

25

operational or ministerial action, which is not." Kolitch v. Lindedahl, 100 N.J. 485, 495 (1985). "A 'discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.'" S.P. v. Newark Police Dep't, 428 N.J. Super. 210, 230 (App. Div. 2012) (quoting Kolitch, 100 N.J. at 495). In contrast, a ministerial act not entitled to immunity under the TCA "is 'one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done.'" Parsons v. Mullica Twp. Bd. of Educ., 440 N.J. Super. 79, 91-92 (App. Div. 2015) (quoting S.P., 428 N.J. Super. at 231), aff'd, 226 N.J. 297 (2016).

"[T]he burden is on the public entity both to plead and prove its immunity" under the TCA with "proof of a nature and character [that] would exclude any genuine dispute of fact." Kolitch, 100 N.J. at 497; see S.P., 428 N.J. Super. at 231 ("The burden is placed on the public entity to establish whether discretion was exercised."). "[O]nce a moving party has met that burden, summary judgment is warranted and, indeed, desirable, as a matter of judicial economy." Kolitch, 100 N.J. at 497 (quoting Ellison v. Hous. Auth. of South Amboy, 162 N.J. Super. 347, 351 (App. Div. 1978)).

26

N.J.S.A. 52:17C-10, the 9-1-1 immunity statute upon which the County relies in addition to the TCA, "shield[s] public and private entities, and their personnel, from civil liability for certain acts of ordinary negligence arising from the operation of the 9-1-1 system" so long as the negligent acts or omissions do not constitute "a wanton and willful disregard for the safety of persons and property." Wilson v. City of Jersey City, 209 N.J. 558, 563 (2012). The statute states, in relevant part:

> No telephone company, person providing commercial mobile radio service as defined in 47 U.S.C. 332(d), public safety answering point, or manufacturer supplying equipment to a telephone company, wireless telephone company, or PSAP, or any employee, director, officer, or agent of any such entity, shall be liable to any person for civil damages, or subject to criminal prosecution resulting from or caused by any act, failure or omission in the development, design, installation, operation, maintenance, performance or provisioning of any hardware, software, or any other aspect of delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service. This limitation of liability is inapplicable if such failure resulted from a malicious purpose or a wanton and willful disregard for the safety of persons or property.
>
> [N.J.S.A. 52:17C-10(d).]

The technical terminology used within N.J.S.A. 52:17C-10(d) is defined at N.J.S.A. 52:17C-1. A "PSAP" is "a facility, operated on a 24-hour basis,

assigned the responsibility of receiving 9-1-1 calls and, as appropriate, directly dispatching emergency response services or transferring or relaying emergency 9-1-1 calls to other public safety agencies." N.J.S.A. 52:17C-1(l). "A [PSAP] is the first point of reception by a public safety agency of 9-1-1 calls and serves the jurisdictions in which it is located or other participating jurisdictions." Ibid.

"Enhanced 9-1-1 service" is "a service consisting of telephone network features and public safety answering points provided for users of the public telephone system enabling the users to reach a public service answering point by dialing the digits '9-1-1.'" N.J.S.A. 52:17C-1(g). "The service directs 9-1-1 calls to appropriate [PSAP] by selective routing based on the location from which the call originated and provides for automatic number identification and automatic location identification features."[5] Ibid.

"Wireless 9-1-1 service" is "the service which enables wireless telephone company customers to dial the digits 9-1-1 and be connected to a public safety agency." N.J.S.A. 52:17C-1(r). "Wireless enhanced 9-1-1 service" is "the

---

[5] "Automatic number identification (ANI) . . . enables the automatic display of the callback number used to place a 9-1-1 call" and "automatic location identification . . . enables the automatic display of information defining the geographical location of the telephone used to place a 9-1-1 call." N.J.S.A. 52:17C-1(a) to (b).

service required to be provided by a wireless telephone company pursuant to Federal Communications Commission wireless 9-1-1 requirements."  N.J.S.A. 52:17C-1(s).

Here, plaintiffs do not dispute the trial court's determination that the Borough's decisions to enter into the Agreement with the County for dispatching services, to have the Police Department unstaffed on weekends, to decline to inspect the vestibule area on weekends, and declining to monitor the surveillance video, were discretionary.  Instead, plaintiffs dispute the court's determination that the Borough's decision to install the red telephone in the vestibule was discretionary, contending that the Borough failed to prove that:  (1) "any actual high-level policy making decisions were made concerning the red vestibule telephone, which involved the balancing of competing considerations"; or (2) "it exercised judgment and/or discretion in the use of its resources and [staff] to serve the needs of the public concerning the decisions made about the red vestibule telephone."  We discern no error.

The record supports the trial court's conclusion that the Borough's installation and configuration of the red telephone was inherently intertwined with its Agreement with the County.  The Borough's action involved a "high level discretionary policy decision[] whether to burden the taxpayers to furnish

equipment, material, facilities, personnel or services," and such decisions are "absolutely immune" from liability under N.J.S.A. 59:2-3(c). Lopez v. City of Elizabeth, 245 N.J. Super. 153, 164 (App. Div. 1991).

Druetzler's certification states that the Borough installed the red telephone "as a direct result of the eliminations of the Borough's dispatcher positions" following entry into the Agreement with the County for dispatcher services.[6] It is undisputed that calls placed from the red telephone were to be fielded by the CCC, not the Borough. Moreover, the Borough's decision to configure the red telephone to place calls from an administrative line as opposed to a 9-1-1 phone line was a "high level discretionary policy decision" under N.J.S.A. 59:2-3(c), "[that] called for the exercise of personal deliberations and judgment, which in turn entail[ed] examining the facts, reaching reasoned conclusions, and acting

---

[6] Plaintiffs claim that they "objected" to Druetzler's certification, submitted as part of the Borough's opposition to their cross-motion for summary judgment, because Druetzler "was not identified in either written discovery responses or during depositions as having relevant knowledge during the discovery period." However, it does not appear from the record that they moved to exclude the certification from evidence. Because none of plaintiffs' interrogatories required the Borough to identify Druetzler, their reliance on Rule 4:17-7 and Rule 4:24-1(c) is misplaced. Moreover, Druetzler signed the Agreement on behalf of the Borough, which plaintiffs received during discovery. Thus, it was apparent that Druetzler had relevant knowledge, and at trial, the court found that the Borough was entitled to summary judgment "even without considering the newly-submitted certification" from Druetzler.

in a way not specifically directed," <u>S.P.</u>, 428 N.J. Super. at 320, warranting the grant of summary judgment. <u>Lopez</u>, 245 N.J. Super. at 164. Plaintiffs' reliance on <u>Costa</u>, 83 N.J. at 59, <u>Thompson v. Newark Hous. Auth.</u>, 108 N.J. 525, 537 (1987), and unpublished opinions to support their contentions on appeal are unavailing.

In <u>Costa</u>, our Court held that the Department of Transportation was not entitled to TCA immunity under N.J.S.A. 59:2-3(a) with respect to its decision to approve a road resurfacing project because there was no evidence "to indicate that any competing policy choices were actually considered when the resurfacing plan was made and approval given." <u>Costa</u>, 83 N.J. at 60. Because <u>Costa</u> does not address the immunity available to public entities under N.J.S.A. 59:2-3(c), it has no relevance to the matter under review.

In <u>Thompson</u>, "[t]he single question presented in [the] plaintiffs' petition for certification" was "whether the 'plan or design' immunity afforded by N.J.S.A. 59:4-6 relieves [the] defendant of liability 'for failure to provide smoke detectors in public housing projects despite a city ordinance requiring' such devices," and the instant matter does not involve plan or design immunity. 108 N.J. at 532.

As to the unpublished opinions cited in plaintiffs' brief, "[n]o unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3. Additionally, with few exceptions that are not applicable here, "no unpublished opinion shall be cited by any court." Ibid. Unpublished opinions are not precedential.

Finally, plaintiffs take issue with the trial court's usage of the words "suggest," "strongly suggests," and "suggesting" in its decision, claiming that it shows that the evidence was insufficient to support a grant of summary judgment to the Borough. We reject plaintiffs' argument. "[A]ppeals are taken from judgments or orders and not from the court's reasoning." Kandrac v. Marrazzo's Mkt., 429 N.J. Super. 79, 84 (App. Div. 2012). "[I]f the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance." Isko v. Plan. Bd. of Livingston, 51 N.J. 162, 175 (1968), abrogated on other grounds by Com. Realty and Res. Corp. v. First Atl. Props. Co., 122 N.J. 546, 558-59 (1991). Thus, the trial court's usage of certain words in an effort to explain its reasoning does not detract from the evidence contained in the summary judgment record to support the conclusion that the Borough's actions with regard to installation and configuration of the

red telephone fell squarely within the absolute immunity granted by N.J.S.A. 59:2-3(c).

As stated previously, we part company with the trial court's denial of summary judgment to the County finding the County's "activities at issue" that proximately caused Covello's death were "ministerial activities."[7] With respect to the red telephone, the court found the ministerial actions that plaintiffs ascribe to the Borough were "attributable instead to the County, largely because the Agreement itself passed on such responsibilities . . . to 'accept and transmit emergency calls for police' on a 'continuous [twenty-four] hour per day basis.'" The trial court also concluded the County was not entitled to immunity pursuant to N.J.S.A. 52:17C-10(d) because Covello's call was not a 9-1-1 call, an administrative line rather than a 9-1-1 line is the responsibility of the County. Viewing, as we must, the record in a light most favorable to plaintiffs, we conclude the trial court erred in denying the County's cross-motion for summary judgment as to the issue of liability.

As a threshold matter, the County does not dispute the court's finding that Glogolich's actions with respect to handling Covello's call were ministerial and

---

[7]  Once again, in analyzing whether the County was entitled to discretionary immunity, the court erroneously cited N.J.S.A. 59:3-2, which pertains to public employees, instead of N.J.S.A. 59:2-3, which pertains to public entities.

A-2043-19

in accordance with the CCC policy. The testimony of multiple deponents supports the conclusion that there was no way for Glogolich or any dispatcher to redial or recall a phone number placed on the red telephone because the Borough, not the County, did not configure the red telephone as a 9-1-1 line.

However, the record before us clearly shows that the only act the County did here was provide a ten-digit administrative, call forwarding number for the red telephone so that calls from the red telephone could be routed appropriately. The competent, credible evidence in the record shows the Borough was responsible for the installation, maintenance, and configuration of the red telephone, and plaintiffs provided no proof to the contrary. Saliently, the red telephone did not permit the user to dial any number. Moreover, the proofs confirm that Covello's call was not a 9-1-1 call. Therefore, the trial court erred in finding that the County failed to have procedures in place to handle emergent calls where the caller was unable to speak or got disconnected. Thus, Glogolich's handling of Covello's call was discretionary, and the County is entitled to immunity. We note that plaintiffs did not present any evidence that the County had an obligation to establish 9-1-1 services for the Borough's red telephone to defeat the County's cross-motion for summary judgment. "To defeat a motion for summary judgment, the opponent must 'come forward with

evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)).

The immunity granted to 9-1-1 operators by N.J.S.A. 52:17C-10(d), per the statute's plain language, pertains only to "delivering enhanced 9-1-1 service, wireless 9-1-1 service or wireless enhanced 9-1-1 service." It is uncontested that Covello did not dial 9-1-1 to reach the CCC from the red telephone. The red telephone did not permit the user to dial any number. It was activated "by picking up the handset which connect[ed] it to the county dispatcher." Calls placed from the red telephone utilized a ten-digit Borough administrative phone line, not a 9-1-1 phone line, and were automatically forwarded to the CCC once the handset was lifted.

The "paramount goal in interpreting a statute is to give effect to the Legislature's intent." Wilson, 209 N.J. at 572. "When that intent is revealed by a statute's plain language – ascribing to the words used 'their ordinary meaning and significance' – we need look no further." Ibid. (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). Courts will not "rewrite a plainly-written enactment of the Legislature []or presume that the Legislature intended something other

than that expressed by way of the plain language." DiProspero, 183 N.J. at 492 (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)) (alteration in original).

The trial court's comments reveal that it improvidently placed responsibility for the red telephone on the County. It was the Borough that exclusively determined not to configure the red telephone as a 9-1-1 line, not the County. Moreover, the competent evidence in the record shows unequivocally that the purpose of the red telephone was to allow the Borough to respond to routine requests for police information. Significantly, the record is clear that the County had procedures in place to handle emergency services for calls coming in on a 9-1-1 line.

In the present case, the County had no obligation to install or configure the Borough's red telephone as a 9-1-1 line. Our conclusion in this regard is consistent with N.J.S.A. 59:2-3. The fact that the Borough installed a 9-1-1 line after Covello's death is not germane to our analysis because this subsequent remedial measure has no relevance to any fact in issue here. N.J.R.E. 407. Based upon our de novo review, we conclude that the trial court erred in denying the County's cross-motion for summary judgment and conclude that the County was entitled to summary judgment based on the same TCA discretionary immunity as the Borough under N.J.S.A. 59:2-3. For this reason, we reverse the

May 31, 2019 order insofar as it did not grant the County's cross-motion for summary judgment in its entirety.

In light of our decision, we need not address the issues raised in plaintiffs' appeal and the County's cross-appeal relative to the trial court granting the County's motion for involuntary dismissal or the point raised in the County's cross-appeal regarding punitive damages.

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2043-19